Filed 5/22/13  Timothy R. v,. Super. Ct. CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE


| | |
|---|---|
| TIMOTHY R., <br><br> Petitioner; <br><br> v. <br><br> THE SUPERIOR COURT OF ORANGE COUNTY, <br><br> Respondent; <br><br> ORANGE COUNTY SOCIAL SERVICES AGENCY et al., <br><br> Real Parties in Interest. | G048078 <br><br> (Super. Ct. No. DP021514-001) <br><br> O P I N I O N |


Original proceedings; petition for a writ of mandate to challenge orders of the Superior Court of Orange County, Dennis J. Keough, Judge.  Petition denied.

Law Office of Patricia Smeets Rossmeisl and Patricia Smeets Rossmeisl for Petitioner.

No appearance for Respondent.

Nicholas S. Chrisos, County Counsel, Karen L. Christensen and Aurelio Torre, Deputy County Counsel, for Real Party in Interest Orange County Social Services. Law Office of Harold LaFlamme and Jess Ann Hite for minor.

\* \* \*

At the 18-month review hearing (Welf. & Inst. Code, § 366.22, subd. (a); Cal. Rules of Court, rule 5.720)[1] in the dependency case of four-year old M.R. (son), the trial court declined to return son to the custody of his parents. The court instead terminated reunification services and set a hearing under section 366.26 to consider the termination of parental rights. Timothy R. (father) challenges the court's orders by petition for writ of mandate. (See Cal. Rules of Court, rule 8.452.) Because the court's orders are supported by substantial evidence, we deny father's petition.

## FACTS

In February 2011, a family law court placed son in the care of his paternal grandmother "due to ongoing concerns of substance abuse and domestic violence" involving father and mother and the failure of parents to comply with substance abuse testing obligations imposed in the family law case. The family court matter was initiated by father against mother in an attempt to gain custody of son following an incident in which mother allegedly took son away from father for four weeks. In July 2011, the paternal grandmother informed Orange County Social Services Agency (SSA) that she could no longer care for son.

---

[1] All statutory references are to the Welfare and Institutions Code.

2

Having detained son on July 28, 2011, SSA shortly thereafter filed a juvenile dependency petition pursuant to section 300, subdivision (b), signifying parents' alleged failure to protect son. Both father and mother pleaded no contest to the allegations of an amended petition. The court declared son to be a dependent of the court pursuant to section 360, subdivision (d).

In finding son to be a dependent, the court found the allegations in the amended petition to be true by a preponderance of the evidence. Father "has a history of substance abuse since at least 1998 [including] the abuse of heroin, methadone, and alcohol with no documented completion of a substance abuse treatment program." Since 1988, father has been arrested for battery, possession of controlled substances, and driving under the influence causing bodily injury. Mother has a history of transiency, substance abuse, and being arrested for a variety of crimes, as well as a diagnosis of mental illness. Parents "have a history of [confilict] which on numerous unspecified occasions . . . has escalated into verbal and physical domestic violence in the presence of" son.

Father's case plan included a series of service objectives: do not break any laws; accept responsibility for actions; cooperate with social workers; obtain and maintain a stable residence; comply with all court orders; appropriately parent son; and demonstrate age appropriate behavior for son. Father also had a series of tasks to complete: counseling (aimed at anger management and taking responsibility for actions); parental education (at least 26 weeks); and substance abuse services (random drug testing and a 12-step program if any positive tests occurred). Father was entitled to visit son as part of the case plan.

Testimonial and documentary evidence was presented at the contested 18-month review hearing.[2] A series of SSA reports were admitted into evidence. In each

---

[2] The hearing actually started as a 12-month review hearing, but, due to extended testimony and several continuances, the court consolidated the 12-month review

3

report, SSA recommended the termination of reunification services, a suitable placement (with someone other than parents), and the scheduling of a section 366.26 hearing.[3] The social worker was cross-examined with regard to the contents of these reports. Other witnesses included father, one of father's therapists, and several medical doctors. As mother does not contest the court's findings, we focus on evidence pertaining to the question of whether the return of son to father would create a substantial risk of detriment to son.

*Evidence*

Since April 2012, son has been placed with his adult sister. Son adapted well to his placement. But father expressed complaints about the placement, including "difficulty with [son] relating to the father, [son] calling his nephew his brother, and believing that the caretaker is preventing [son] from talking with [father]. The father also complains that his child is 'changing.'"

As of September 12, 2012, father's participation in his case plan was described as "minimal." He made more progress in the time leading up to the completion of the 18-month review hearing.

Father was terminated from his parenting class in April 2012 following an incident in which father angrily threw his chair to the floor and stormed out of the room, slamming the door behind him. Father did not complete the 26 prescribed classes; he was somewhere between three and nine classes short of completion. However, father completed a different 12-hour parenting program on February 4, 2013.

_____

hearing with the 18-month review hearing. Father does not take issue with this procedure.

[3] Counsel for son supported this recommendation below and joins with SSA in urging this court to reject father's petition.

4

Father completed an initial eight week course of counseling in December 2011. But additional therapy was required by SSA. Father refused to continue meeting with a second therapist because he perceived her as being biased against father (because the therapist was already treating mother) and "he felt traumatized by what the therapist had said to him regarding his case." Father was in therapy with a new therapist at the time of the 18-month review, although he missed three meetings without calling to cancel in January 2013. The third therapist provided generally favorable testimony with regard to father's progress on January 7, 2013. The third therapist opined that father posed no risk of harm to his son with regard to unmonitored contact. But according to the final SSA report, the third therapist contacted the social worker on February 13, 2013 and stated that father had made an angry phone call to the therapist. The third therapist opined on February 13 that father has not progressed in his treatment and lacks insight into his problems.

By his own admission, father was a drug addict "for a long time" whose drug of choice was heroin, which he abused for 20 years. Father used methadone from 2006 to 2008 as a way to stop using heroin. Contradicting the court's findings at the jurisdictional hearing, father claims he never abused methadone.

Father missed some drug tests during the dependency. Father left an expletive-laced tirade as a phone message on the social worker's voice mail on January 23, 2013 about a missed drug test. Father's participation in Alcoholics Anonymous and Narcotics Anonymous was inconsistent during the dependency. Father did not "have a sponsor because [he does not] believe in sponsorship." Father obtained a sponsor at the end of 2012 based on SSA input.

Father clashed with the social worker regarding his pain treatment regimen. The social worker admits father has legitimate back pain problems. Father, in possession of a "medical marijuana card," used marijuana to manage his pain at the beginning of the dependency case. Father tested positive for marijuana throughout the beginning of the

5

dependency case. The social worker indicated to father that it would be difficult to advance the family reunification process so long as he tested positive for marijuana. At one point, father acknowledged to the social worker "that his use of marijuana could have compromised his memory and reasoning, and could possibly impact his parenting." Father committed to stop using marijuana in the summer of 2012 "in order to progress to unmonitored visitation." Father relapsed and used marijuana in December 2012.

Due to his history of narcotic addiction, SSA wanted father to treat his back pain with a non-narcotic pain reliever. Having been referred to a pain management specialist, father disagreed with the specialist's advice to take a non-narcotic pain medication and therefore stopped using the drug — without the specialist's approval. The father complained about side effects from this medication, including depression and suicidal ideation.

Father tested positive for methadone and oxycodone toward the end of the dependency case. Father used oxycodone from March 2012 through the summer of 2012. Father began taking methadone for pain in August 2012 under a prescription from a doctor at a Santa Ana clinic. Father did not tell the clinic doctor he was using methadone for pain management; father told the clinic doctor he needed methadone due to an addiction to oxycodone and Vicodin. According to his own testimony, father lied "[b]ecause that's the only way I can go there and receive methadone treatement, to the methadone clinic, because they are not a pain clinic." The social worker was not informed of father's actions in changing medical providers while it was occurring. The social worker was "concerned that [father] is arranging to self medicate on drugs of his choice. He left the pain management clinic that would not prescribe as he wished in order to attend a methadone clinic where he provided deceptive information. This indicates a current and untreated issue with drug addiction."

Father was referred by his general practitioner to three different pain management specialists. Father never informed his general practitioner about his history

6

of heroin abuse. The final pain management specialist, Dr. Philip Chiou, actually prescribed methadone for pain management in December 2012. Dr. Chiou testified that "it would be ideal if we can get [father] on non-narcotics eventually [based on his] history of heroin of abuse . . . ." Dr. Chiou testified that some pain management specialists would not prescribe narcotics to father based on his high score on a screening evaluation. But Dr. Chiou balanced the risks of narcotic dependency and the benefit of effective pain management and concluded father could receive methadone under appropriate monitoring. Had father not already been taking methadone, Dr. Chiou would have tried a non-narcotic pain medication or prescribed methadone at a lower dose.

Due to father's extensive drug history, the social worker would never recommend returning son to father so long as father utilized narcotics. Thus, it appears that in responding to the social worker's concerns about his use of marijuana, father made things worse by exchanging marijuana for narcotics. The social worker indicated she was concerned with the potential effect of father's drug usage on his ability to care for son. SSA guidelines suggest a parent's visitation should be monitored if a parent is testing positive for narcotics, regardless of whether the parent has a prescription.

Father was incarcerated in October 2012 for a probation violation. Father drove with a suspended license. Father did not inform the social worker of his arrest and incarceration.

Father "has continually throughout the case made statements . . . that none of this was his fault, that he doesn't know why his child is here, that he was the good parent, that he did what he needed to do, and that he believes that the information provided in the reports . . . were all lies . . . ."

Father regularly visited son and interacted with son during the visits. Father rarely missed his visitation opportunities with son. "Overall, the father has not struggled in this area . . . . The father shows that he does love his son and wants to spend quality time with him." But during a visit at a park, father became "very aggressive and

loud" while responding to an individual who asked father to move out of an area that had been reserved for a party. After this incident, father's visitation was moved to a facility to allow formal supervision by SSA (rather than caretaker supervision).

Father has steady disability income from the Social Security Administration. Father maintains a stable residence and has appropriate furnishings/supplies for son. Father talked with his therapist about ways to keep mother away from son (e.g., do not inform mother of his address).

*Court's Ruling*

The court did not return son to father, but instead discontinued reunification services and set a section 366.26 hearing to consider the termination of parental rights. The court found reasonable services had been provided to both parents, a finding not challenged in this petition.

The court rejected a bright line rule against returning son to father based on father's continuing usage of either marijuana or methadone. But the court did find father's use of these substances to be troubling based on father's prioritization of his drug use preferences, his adversarial relationship with at least one physician, his failure to disclose his complete medical history to other physicians, and "the patently false statements that [father] made to utilize the services of the . . . Santa Ana Clinic." The court also cited father's relapse (with marijuana) and his failure to engage with a mechanism to avoid relapses (such as a 12-step program).

Aside from substance abuse issues, the court mentioned father's inappropriate usage of profanity and other intimidating behavior in his interaction with various individuals, including his therapist. "And the court understands that we live in a rough and tumble world, and the court is not offended by the use of profanity," but the court was troubled by father's lack of self-control in situations in which he knew his

8

parental rights were at stake. The option of simply fleeing father's anger was not available to a four-year-old child.

The court "did not believe father's testimony that he would be amenable to [family maintenance] services, that what is presented is . . . an individual who . . . believes that it's none of anybody's business and . . . there would be a substantial concern regarding father's ability to accept services which the court would find would be necessary to reasonably assure the child's safety." In sum, the court agreed with SSA that father's substance abuse and self-control issues (which provided the factual basis for the sustained dependency petition) were not sufficiently resolved to allow the return of son to father.

DISCUSSION

At an 18-month review hearing, "[a]fter considering the admissible and relevant evidence, the court shall order the return of the child to the physical custody of his or her parent . . . unless the court finds, by a preponderance of the evidence, that the return of the child to his or her parent . . . would create a substantial risk of detriment to the safety, protection, or physical or emotional well-being of the child. The social worker shall have the burden of establishing that detriment." (§ 366.22, subd. (a).)

SSA "has the burden of establishing detriment. [Citations.] The standard for showing detriment is 'a fairly high one. It cannot mean merely that the parent in question is less than ideal, did not benefit from the reunification services as much as we might have hoped, or seems less capable than an available foster parent or other family member.' [Citation.] Rather, the risk of detriment must be *substantial*, such that returning a child to parental custody represents some danger to the child's physical or emotional well-being." (*In re Yvonne W.* (2008) 165 Cal.App.4th 1394, 1400 (*Yvonne*).) "The failure of the parent . . . to participate regularly and make substantive progress in

9

court-ordered treatment programs shall be prima facie evidence that return would be detrimental." (§ 366.22, subd. (a).)

Father's sole argument on appeal is the court erred in finding the return of son to father's care would create a substantial risk of detriment to son. A juvenile court's factual findings are reviewed under the deferential substantial evidence standard. (*Yvonne*, *supra*, 165 Cal.App.4th at pp. 1400-1401.) "In doing so, we consider the evidence favorably to the prevailing party and resolve all conflicts in support of the trial court's order." (*Id.* at p. 1401.)

Substantial evidence supports the court's finding. Father is a recovering heroin addict with anger management problems and a criminal history. Father failed to comply with SSA's request that he limit pain medication to non-narcotic drugs. Instead, he lied to the methadone clinic to obtain his pain medication of choice and discarded pain management specialists until he found one willing to prescribe his preferred pain medication (methadone). Father failed to demonstrate through therapy or his actions during the dependency case that he would keep his anger under control or that he would cooperate with SSA to ensure the safety of son were son to be returned to father. The relevant question for the court was not whether father complied with some aspects of his case plan (he did) or whether father was a better candidate than mother for reunification with son (he was). The question was whether the return of son to father "would create a substantial risk of detriment to the safety, protection, or physical or emotional well-being of the child." (§ 366.22, subd. (a).) We will not second-guess the court's factual findings, which were premised not only on the evidence available in the record but on credibility determinations made by the court.

Father likens this case to instances where courts inappropriately sustained dependency petitions based purely on parents' marijuana use without any evidence of harm to the children. (*In re Drake M.* (2012) 211 Cal.App.4th 754, 757-758 [father's use of medical marijuana for arthritis]; *In re David M.* (2005) 134 Cal.App.4th 822, 825-827

10

[parents' use of marijuana].)  Of course, it is not disputed that the dependency petition was properly sustained in this case based on the combined inability of mother and father to adequately protect son from harm in 2011.  Moreover, although father's marijuana use played a role in the social worker's refusal to allow unmonitored visitation between father and son, father's use of marijuana is not the basis for the court's ruling at the 18-month review hearing.

Father also cites to cases in which there was insufficient evidence to support trial courts' decisions not to return children to parents.  (See, e.g., *Yvonne*, *supra*, 165 Cal.App.4th at pp. 1401-1402 [mother completed case plan and maintained sobriety for one year; "child's dislike of a parent's living arrangement, without more, does not constitute a substantial risk of detriment"]; *Jennifer A. v. Superior Court* (2004) 117 Cal.App.4th 1322, 1346 ["record does not support a finding . . . that Mother's marijuana use . . . means the children's return to Mother would create a *substantial* risk of detriment"].)  But the potential for substantial risk of detriment to son is apparent in this case based on father's troubled life history and his failure to demonstrate he has put his troubles behind him.  The court was not obligated to return son to father in these circumstances.

11

DISPOSITION

The petition for extraordinary relief is denied.


IKOLA, J.

WE CONCUR:


RYLAARSDAM, ACTING P. J.


BEDSWORTH, J.